**UNITED STATES of America**

v.

**Anthony MEDINA.**

**No. 87–CR–824–3.**

United States District Court, E.D. New York.

Oct. 22, 1990.

Leslie R. Caldwell, Asst. U.S. Atty., Brooklyn, N.Y., for the U.S.

David W. Ely, New York City, for Anthony Medina.

WEINSTEIN, District Judge:

Anthony Medina pled guilty to a violation of the narcotic laws. In 1988 he was sentenced to ten years in the custody of the Attorney General, execution was suspended, and he was given five years probation. As a condition of probation, he was required to refrain from using any narcotic.

In November of 1989, probationer tested positive for cocaine under a routinely administered drug urine analysis. Confronted with the test results, after initially denying narcotics use, he admitted using cocaine. He was then directed to participate in a drug-free treatment program under the supervision of the probation department.

In May of 1990, at a hearing on additional probation violations, the probationer indicated that he had not used drugs for many months. The court ordered radioimmunoassay (RIA) hair analysis to determine if he had ingested narcotics in violation of the conditions of his probation.

Abstinence for a relatively short period either voluntarily or due to incarceration purges blood and urine of traces of narcotics. Thus, drug testing of body fluids for drugs using the usual tests only reveals the use of narcotics in the immediate past. RIA hair analysis, by contrast, reveals drug use over a period of months while hair is growing and absorbing drug traces through the blood stream.

Probationer's hair tested positive for cocaine. If accepted the hair analysis revealed a violation of probation.

RIA hair analysis is a relatively new form of forensic proof not yet recognized by the courts. The court is obliged to consider the basis for its admissibility.

Prior to the enactment of the Federal Rules of Evidence the admissibility of scientific evidence was generally governed by *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923). For scientific evidence to be admissible under *Frye*, "the thing from which the deduction is made must be sufficiently established to have gained acceptance in the particular field in which it belongs." *Id.* at 1014.

Pursuant to the Federal Rules of Evidence, courts should now determine the admissibility of novel scientific evidence by balancing the "relevance, reliability and helpfulness of the evidence against the likelihood of waste of time, confusion and prejudice." *In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1223, 1242 (E.D.N.Y.1985). In *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir.1985), the Third Circuit ruled that admissibility depends on three factors: "(1) the soundness and reliability of the process or technique used in generating the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test to be presented, and particular disputed factual issues in the case." *See also United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979) (to determine admissibility court should balance reliability and helpfulness against countervailing considerations expressed in Rule 403).

In those jurisdictions that purport to follow *Frye*, the issue of reliability—the essence of the newer standard—appears to be synonymous with general acceptance in

the scientific community. *See, e.g., United States v. Franks,* 511 F.2d 25, 33 n. 12 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975). The result reached in a *Frye* or a Federal Rules of Evidence jurisdiction is almost always identical in practice so that decisions under the two rules are interchangeable.

The relevance and helpfulness of RIA hair analysis in establishing evidence of drug ingestion is apparent in the probation violation setting. Accordingly, the primary issue that must be resolved in determining admissibility of RIA hair analysis is reliability.

■ A court should take judicial notice of the relevant body of scientific literature to assist it in evaluating advances in scientific techniques such as RIA hair analysis. *Browning–Ferris Indus. v. Muszynski,* 899 F.2d 151, 161 (2d Cir.1990).

■ Extensive scientific writings on RIA hair analysis establishes both its reliability and its acceptance in the field of forensic toxicology when used to determine cocaine use. *See, e.g.,* Arnold, *Radioimmunological Hair Analysis for Narcotics and Substitutes,* 25 J. Clinical Chemistry and Clinical Biochemistry 753 (1987) (hair analysis is an effective method for detecting narcotics); Balabanova, Brunner & Nowak, *Radioimmunological Determination of Cocaine in Human Hair,* 98 Z Rechtsmed 229 (1987) (same); Baumgartner, Baer, Hill & Blahd, *Hair Analysis for Drugs of Abuse in Parole/Probation Populations,* National Institute of Justice Final Report, (grant 86–IJ–CX–0029) (study compared the results of RIA hair analysis with urinalysis and determined that hair analysis provided more accurate detection rates); Baumgartner, Hill & Blahd, *Hair Analysis for Drugs of Abuse,* 34 J. Forensic Sciences 1433 (1989) (hair analysis for drugs of abuse is an effective means for identifying drug abusers); Graham, Koren, Klein, Schneiderman, & Greenwald, *Determination of Gestational Cocaine Exposure by Hair Analysis,* 262 J.A.M.A. 3328 (1989) (RIA hair analysis may remedy the disadvantages of standard blood and urine tests); Harkey & Henderson, *Hair Analysis for Drugs of Abuse* in 2 Advances in Analytical Toxicology 298 (R. Baselt ed. 1989) (hair analysis can provide a more accurate history of drug use than conventional urinalysis); Smith & Liu, *Detection of Cocaine Metabolite in Perspiration Stain, Menstrual Bloodstain and Hair,* 31 J. of Forensic Sciences 582 (1981) (same); *see also United States v. Riley,* 906 F.2d 841, 853 (2d Cir.1990) (dissent on other grounds) (hair could be analyzed to show use of narcotics); *cf. Burgel v. Burgel,* 141 A.D.2d 215, 533 N.Y.S.2d 735 (2d Dep't 1988) (radioimmunoassay of hair is permissible form of discovery). *See generally* Society of Forensic Toxicologists, *Bibliography of Conference on Hair Analysis for Drugs of Abuse* (1990). *But cf. United States v. Foote,* 898 F.2d 659, 665 (8th Cir.1990) (affirming district court's denial of defendant's motion to compel radioimmunoassay of police officer's hair). Moreover, even though the application of the technique to detect controlled substances is relatively recent, hair analysis has been used to detect the presence of metals or nutrients for almost twenty years. *See, e.g.,* Harkey & Henderson, *supra,* at 325–26.

Some forensic scientists caution against widespread use of RIA hair analysis until more is known about the mechanism by which controlled substances are incorporated into human hair and the minimum amount necessary to produce a positive result can be standardized. *See, e.g.,* Bailey, *Drug Screening in an Unconventional Matrix,* 262 J.A.M.A. 3331 (1989); Harkey & Henderson, *supra,* at 326. This hesitation, centering around the biochemical mechanisms of narcotics absorption and quality control in the laboratory, is not based upon a challenge to the basic scientific principles of analytical chemistry which are the foundation of radioimmunoassay. These accepted principles establish that radioimmunoassay is an effective and accurate method of detecting the presence of various compounds including narcotics.

■ In addition to satisfying itself on general theoretical soundness, before ad-

mitting relatively novel scientific evidence the court should determine that (1) the sample was properly obtained—here, for example, by obtaining hair from appropriate portions of the body, (2) the particular laboratory technique used was sound and (3) the laboratory was careful and accurate in its use of that technique. *See, e.g., People v. Castro*, 144 Misc.2d 956, 545 N.Y. S.2d 985 (Sup.Ct.1989) (DNA testing theory sound but application flawed); *State v. Schwartz*, 447 N.W.2d 422, 426–27 (Minn. 1989) (same); Gianelli, *The Admissibility of Novel Scientific Evidence*, 80 Colum.L. Rev. 1197, 1226 (1980).

No challenge was made to the method of hair sampling or to the soundness or accuracy of the laboratory's work in the instant case. Nor were these issues in doubt since probationer readily admitted the accuracy of the test result upon being confronted with it.

There was no possibility of jury confusion or prejudice because a probation violation hearing is a non-jury proceeding. The aura of reliability which attaches to scientific evidence can be expected to have less impact in a bench than in a jury trial. *See United States v. Downing*, 753 F.2d 1224, 1235 (3d Cir.1985); *United States v. Solomon*, 753 F.2d 1522, 1525–26 (9th Cir.1985); *cf. United States v. Williams*, 583 F.2d 1194 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979) (court's limiting instruction as to spectrographic voice identification stressed that jury could disregard expert testimony).

The results of the hair analysis report are accepted as some proof that probationer violated the conditions of his probation. Other evidence supports that conclusion beyond any possible doubt.

So ordered.