OPINION OF THE COURT
David Freundlich, J.
In this private placement adoption proceeding commenced pursuant to the provisions of article VII of the Domestic Relations Law (Domestic Relations Law § 109 et seq.), the biological mother has timely revoked her "extra-judicial” adoption consent, thereby triggering what is commonly referred to as a "best interests” hearing under Domestic Relations Law § 115-b (6) (d). (See, e.g., Matter of Sarah K., 66 NY2d 223 [1985].) The statutory best interest hearing was *354 recently conducted before the undersigned,* it was within the said hearing that the instant evidentiary issue arose.
The precise question before the court is whether certain evidence offered by the adoptive parents, to wit, the results of a radioimmunoassay analysis (hereinafter referred to as RIA) of the biological parents’ hair, ought to be received in evidence and considered by the court as part of the evidentiary record of this proceeding. Resolution of this issue depends entirely upon the standards of admissibility of such evidence as set forth in People v Middleton (54 NY2d 42) and Frye v United States (293 F 1013 [1923]), which was the subject of a collateral hearing (labeled by the court as a "Frye” hearing) conducted on November 17, 1992. The foregoing was required inasmuch as the court was unable to find any controlling precedent and/or absolute authority for the proposition that the results of RIA hair analysis are generally admissible in civil trials and/or proceedings in the courts of this State. It is the court’s belief that this is a matter of first impression in the courts of this State. (See, e.g., Burgel v Burgel, 141 AD2d 215 [2d Dept 1988].)
A brief procedural summary is appropriate. As noted, this is an adoption proceeding wherein the biological mother has timely filed a revocation of her "extra-judicial” adoption consent, thereby precipitating a statutory "best interests” hearing. Upon the initial calendaring of the matter on August 11, 1992, the parties stipulated to certain pretrial discovery, including, but not limited to, the delivery of samples of the biological mother’s hair and the biological father’s hair for purposes of RIA analysis by a designated laboratory, ostensibly for the purpose of ascertaining the extent, if any, of the biological parents’ use of controlled substances. In accordance with the parties’ stipulation, an order was entered on August 12, 1992, which, inter alla, directed that the aforesaid hair samples be produced.
It should be noted that the constitutional and/or procedural concerns that were outlined by the Appellate Division, Second Department, in Garvin v Garvin (162 AD2d 497 [1990]) and Burgel v Burgel (supra) were not present herein inasmuch as the parties expressly consented to the production of hair samples for the purpose of testing by RIA analysis. It should be further noted that the stipulation and the order of August *355 12, 1992 were limited to the delivery of the sample, there being no express or implied agreement that the results of the RIA analysis would be automatically received in evidence without objection by the biological parents.
After the aforesaid pretrial stipulation was entered into, and upon completion of all required pretrial discovery, the statutory "best interest” hearing commenced on September 12, 1992 and was thereafter continued over the course of several trial days in September, October and November 1992.
On October 22, 1992 and after substantial testimony by the parties and their respective witnesses, the adoptive parents attempted to offer the testimony of Dr. Jesse Bidanset, the chief consulting toxicologist at Inter-City Testing Corp. and a professor at St. John’s University (Department of Pharmaceutical Sciences), who allegedly conducted the RIA analysis of the biological parents’ hair and who presumably would testify as to the results of such analysis. The biological parents promptly interposed an objection to the introduction of Dr. Bidanset’s testimony, claiming, inter alla, that the scientific procedure commonly referred to as RIA hair analysis (for purposes of detecting the extent of drug use) has not been shown to be endorsed by the general scientific community as a reliable and scientifically acceptable procedure, and therefore, the results of such analysis should not be received in evidence by the court.
After substantial colloquy on the record and subsequent legal research, the court entered an order on November 5, 1992 wherein it sustained the biological parents’ evidentiary objection solely to the extent that the question of reliability— and the ultimate admissibility — of the RIA hair analysis was referred to hearing in accordance with Frye v United States (supra) and People v Middleton (supra). The aforesaid hearing was conducted on November 17, 1992.
In support of the adoptive parents’ contention that RIA analysis of hair (for the purposes of detecting drug use) is generally accepted by the relevant scientific community as accurate and reliable, the testimony of Dr. Bidanset was offered. In addition to his current experience (noted supra), Dr. Bidanset was formerly chief toxicologist in the Nassau County Office of Medical Examiner, as well as a consulting forensic toxicologist for the Rockland County Medical Examiner’s office. He is associated with numerous scientific organizations and institutions, and has served as president of the Society of *356 Forensic Toxicologists. He is also widely published in the field of forensic toxicology, including the area of radioimmunoassay testing. In the court’s opinion, Dr. Bidanset is a qualified expert, both as to the technical aspects of RIA hair analysis and as to its acceptance by the scientific community as an accurate and reliable method of measuring the use of controlled substances.
Dr. Bidanset testified at length as to the technical intricacies of the RIA process as it relates to the testing of hair samples for the presence of certain substances, including cocaine. The witness credibly informed the court — albeit in a technical, scientific manner — that a compound such as cocaine metabolizes in the body system and ultimately produces a peculiar chemical by-product which tends to preserve itself in human hair follicles. The RIA process essentially analyzes the chemical content of the hair and produces an informative result, not only as to the actual ingestion of the drug, but as to significant quantitative information such as the severity and pattern of the individual’s drug use. Dr. Bidanset testified that the RIA process, while accurate and reliable, becomes even more probative and reliable when used in conjunction with other related testing procedures, such as gas chromatography-mass spectrometry (GCMS), which are confirmatory tests to be utilized with the RIA analysis.
Dr. Bidanset’s testimony regarding the RIA process (whether used alone or in conjunction with GCMS confirmation), while enlightening and informative, is not critical to the resolution of the issue at bar, to wit, whether the test is generally accepted as reliable and accurate. In this regard, the witness credibly and intelligently indicated that he is quite familiar with the relevant toxicological community and its current attitude and/or position with respect to the use of RIA hair analysis as a method of detecting individual drug use. By way of his own professional experience and affiliations, and with reference to numerous writings contained in professional journals (Journal of Forensic Sciences, Journal of Analytical Toxicology), Dr. Bidanset gave a firm opinion that the RIA analysis of hair is generally accepted by the scientific (toxicological) community as an accurate and reliable method of measuring drug use, particularly when confirmed by way of GCMS procedures. The witness pointed to the widespread use of the test by private enterprise and by governmental entities, including Medical Examiners and the United States Armed Services, which has significantly increased in recent years.
*357 It bears noting that the expert in no way suggested that the RIA hair analysis was universally accepted by each and every professional without reservation. The doctor candidly acknowledged that there was some disagreement among his peers as to the validity of the results of the test. However, the criticism from these professional peers did not relate to the acceptance of the test, per se, as a scientifically valid methodology. Rather, the criticism revolved around the particular conduct of the test and/or the interpretation of the results, there being the possibility that mistakes or "false positives” could result from improper procedure, lack of controls, or from environmental interference. Dr. Bidanset recognized these concerns, but noted in an unequivocal manner that the RIA process, when properly conducted and controlled, yields a reliable result which is accepted by the relevant scientific community.
The expert’s opinions were, to a large degree, confirmed by the petitioner’s own expert, Dr. Thomas Manning, who is currently the chief toxicologist in the Nassau County Medical Examiner’s office, and who formerly served as deputy to Dr. Bidanset during Dr. Bidanset’s tenure as chief toxicologist. Dr. Manning testified that in his opinion, the RIA hair analysis was not entirely accepted by the Society of Forensic Toxicologists. He specifically referred to that Society’s advisory committee report dated August 11, 1992, which purportedly contained numerous examples of peer criticism of the test. However, upon further examination, Dr. Manning acknowledged that he personally and professionally regarded the test as being accurate and reliable, therein indicating (as did Dr. Bidanset) that the "peer criticism” was directed more to the mechanics of the testing process than to the scientific validity of the test itself.
This distinction is entirely supported by the written report of the Society’s advisory committee. This report, which by its terms does not represent the official position of the Forensic Society (it is but an advisory committee statement), nevertheless indicates that from an analytical standpoint, the RIA process, when used in conjunction with GCMS, has indeed risen to a level of forensic acceptability.
On balance, the court finds no substantial disagreement between the two experts who offered their opinion in this matter. Both indicated that the process of RIA of human hair —especially when accomplished with GCMS testing — provided an accurate and reliable method of measuring the use of *358 cocaine by human subjects. Both noted that the process in question was generally accepted by the particular toxicological community as being valid, probative, accurate and reliable. Both generally agreed that there was some criticism with respect to the interpretive results of the test, but that such criticism related to the need for individual testing controls and proper methodology, not to the scientific validity of the process itself.
The court observes that the Hon. Jack Weinstein, District Judge in the Eastern District of New York, has concluded that the process of RIA hair analysis has been accepted as reliable and accurate by the forensic community. In United States v Medina (749 F Supp 59 [1990]), Judge Weinstein took judicial notice of extensive writings which supported the acceptance and reliability of the test by the forensic community, whereupon he concluded that the evidence of the test results was admissible in the Federal court under the standard set forth in Frye v United States (supra). This court fully agrees with Judge Weinstein and otherwise adopts and refers to the voluminous professional writings set forth in the Judge’s decision.
Based on the foregoing, and considering the totality of the evidence adduced in this hearing, this court concludes that the process of RIA testing of human hair, when used in conjunction with GCMS confirming procedures, has been accepted by the scientific community as a reliable and accurate method of ascertaining and measuring the use of cocaine by human subjects. The results of such testing may therefore be offered in evidence, in accord with Frye v United States (supra) and People v Middleton (supra). The ultimate acceptance of such results, or the weight to be accorded same, is a matter to be resolved by the trier of fact, who arguably may consider any credible challenge to the particular method of hair sampling or to the soundness, propriety or accuracy of the particular laboratory’s work or to any substantial testing defect that may produce a suspect result. (See, e.g., People v Medina, supra.) In the case at bar, no such challenge was made. Accordingly, the test results may be received and considered by the court as a part of the evidentiary record of this proceeding.

 A separate decision is being issued with respect to the court’s disposition of that matter under Domestic Relations Law § 115-b (6) (d) (ii).